# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| TONYA JAMES, | ) |
| Plaintiff, | ) ) ) |
| v. | ) No. 13 C 3685 ) |
| CAROLYN W. COLVIN, Acting Commissioner of Social Security, | ) Magistrate Judge Finnegan ) ) |
| Defendant. | ) ) |

## MEMORANDUM OPINION AND ORDER

Plaintiff Tonya James seeks to overturn the final decision of the Commissioner of Social Security ("Commissioner" or "Defendant") denying her applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act. 42 U.S.C. §§ 416, 423(d), 1381a. The parties consented to the jurisdiction of the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c), and filed cross-motions for summary judgment. After careful review of the record, the Court now grants Plaintiff's motion, denies Defendant's motion, and remands the case for further proceedings.

## PROCEDURAL HISTORY

Plaintiff applied for DIB and SSI on March 29, 2010, alleging in both applications that she became disabled on March 24, 2010 due to a hearing impairment and hepatitis C. (R. 142, 149, 177). The Social Security Administration denied the applications initially on July 20, 2010, and again upon reconsideration on September 22, 2010. (R. 70-86). Plaintiff filed a timely request for hearing and appeared before Administrative Law Judge Jose Anglada (the "ALJ") on February 1, 2012. (R. 38). The ALJ heard

testimony from Plaintiff, who was represented by counsel, as well as from vocational expert Glee Ann L. Kehr (the "VE"). Shortly thereafter, on March 15, 2012, the ALJ found that Plaintiff is not disabled because there are a significant number of light jobs she can perform. (R. 18-30). The Appeals Council denied Plaintiff's request for review, (R. 1-3), and Plaintiff now seeks judicial review of the ALJ's decision, which stands as the final decision of the Commissioner.

Plaintiff raises numerous arguments in support of her request for remand, including that the ALJ: (1) did not provide an evidentiary basis for the residual functional capacity ("RFC") assessment that she is capable of light work; (2) failed to explain why she can work despite significant hearing loss; (3) provided no rationale for finding that she would be off-task for 4% of an 8-hour workday; (4) afforded improper weight to the opinion from Dr. Huhn; and (5) made a flawed credibility determination. As discussed below, the Court agrees that remand is appropriate because the RFC assessment is not supported by substantial evidence.

## **FACTUAL BACKGROUND**

Plaintiff was born on September 11, 1960 and lives with her boyfriend, her daughter and her grandson, who was four years old at the time of the hearing. (R. 41, 142). She completed high school and has worked at various times as an instructor for Goodwill and an encoding machine operator instructor. (R. 41, 170, 179). Most recently, Plaintiff spent seven years doing data entry at a bank until she was laid off in May 2009. (R. 178-79). She now takes care of her grandson part-time while her daughter is at work. (R. 42-43).

## A. Medical History

Plaintiff has been wearing hearing aids since childhood and was diagnosed with HIV in 2004. (R. 312, 314). The first available medical note is from January 2009, when Plaintiff went to see Gregory Huhn, M.D., at the Core Center for treatment of HIV, hepatitis C ("HCV") and hypertension. The handwritten notes are difficult to decipher, but it appears that Plaintiff was fully compliant with her medications at that time. (R. 312). Nearly a year later, on December 3, 2009, Plaintiff returned to Dr. Huhn with "no complaints." (R. 310). She similarly expressed "no complaints" at a December 30, 2009 follow-up exam. (R. 309).

### 1. 2010

Plaintiff continued to have regular visits with Dr. Huhn throughout 2010. On March 10, 2010, he changed her HAART (highly active antiretroviral therapy) regimen for HIV, (R. 308), and at the next appointment on March 24, 2010, she complained of "profound dizziness" that persisted throughout the day and made her head feel "somewhat disconnected." (R. 307). Dr. Huhn readjusted the medication and by April 7, 2010, the dizziness had "fully resolved" and Plaintiff once again had "no complaints." (R. 306). When Plaintiff returned to Dr. Huhn on May 5, 2010, she asked him to complete some disability forms in connection with the application for benefits she had filed in late March. (R. 305). A week later, on May 12, 2010, Plaintiff told Dr. Huhn that she was "overall feeling well though easily fatigued." The rest of the notes are largely illegible. (R. 345).

On June 4, 2010, M.S. Patil, M.D., performed an Internal Medicine Consultative Examination of Plaintiff for the Bureau of Disability Determination Services ("DDS"). (R.

3

314-16). Plaintiff told Dr. Patil about her many years of HCV treatment but said she had no related complaints at that time. She also discussed her hearing loss, noting that though her right hearing aid had broken five months earlier and the left one kept "buzzing all the time," she did not have insurance to replace the devices. (R. 314). Plaintiff's physical examination was largely unremarkable, as she exhibited full motor strength of 5/5 in the arms and legs, normal gait, normal ability to perform fine and gross manipulative movements of the hands and fingers, and full range of motion in all joints. (R. 315-16). Dr. Patil diagnosed HCV and moderate to severe hearing loss at a distance of six feet "even with the left hearing aid," possibly due to malfunction. (R. 316). There is no evidence that Dr. Patil was aware of Plaintiff's HIV status.

Later that month, on June 24, 2010, Plaintiff had a hearing test with clinical audiologist Natalia Rubin, M.S. (R. 324, 389). Ms. Rubin indicated that Plaintiff "will experience significant difficulties hearing speech," with "limited benefit from the use of amplification." She recommended new hearing aids for both ears. (*Id.*). Plaintiff gave Dr. Huhn the hearing aid paperwork on July 7, 2010, but it is not clear that she was ever able to obtain the new devices. Dr. Huhn's notes reflect that Plaintiff was fully compliant with her medications and "feeling much better." (R. 343).

On July 19, 2010, Towfig Arjmand, M.D., completed a Physical Residual Functional Capacity Assessment of Plaintiff for DDS. (R. 328-35). He found that she has no exertional, postural, manipulative or visual limitations, but she must avoid concentrated exposure to noise because of her hearing loss. (R. 329-32, 335). Charles Kenney, M.D., affirmed this RFC assessment on September 22, 2010. (R. 349-50).

4

In the meantime, Plaintiff continued to "feel[] well" at a follow-up visit with Dr. Huhn on August 18, 2010, and remained fully compliant with her medication. (R. 341). She likewise had no complaints during an October 13, 2010 appointment and reported tolerating her medications well. (R. 357-58).

### 2. January 2011 through January 2012

Plaintiff's regular treatment with Dr. Huhn continued into 2011, beginning with a visit on January 12. Dr. Huhn stated that Plaintiff was "[o]verall doing well" at that time, though she was also "feel[ing] tired during the day," as she "watches after [an] active grandson." (R. 364). Later in the report, Dr. Huhn indicated that the fatigue "may be secondary to HCV," noting that Plaintiff's CD4[1] count was stable but low due to that longstanding infection. (R. 368). He then described the fatigue as "possibly secondary to longstanding HCV vs stress with supervising active grandson and unemployment." (*Id.*). Also in this note, Dr. Huhn reported for the first time that Plaintiff has AIDS as opposed to just HIV, but described it as "well controlled." (R. 364). He also indicated that Plaintiff suffers from leukopenia (low white blood cell count) secondary to HIV and HCV, but that she had "no complications" from the condition. (R. 368).

On March 9, 2011, Plaintiff was doing well overall but still felt tired during the day while watching after her active grandson. She newly complained of right upper arm pain and paresthesia lasting two weeks, and said the symptoms were worse when she laid down at night or handled objects with her right hand. Plaintiff reported no acute injury but said she "does a lot of lifting with taking care of [her] grandson." (R. 370). Dr.

---

[1] CD4 cells, also known as T-cells, "activate [the] body's immune response" and play an "important role" in "how [the] body fights off infections." (www.aids.gov/hiv-aids-basics/just-diagnosed-with-hiv-aids/understand-your-test-results/cd4-count/, last viewed on July 15, 2014).

5

Huhn noted that Plaintiff experienced "[m]ild pain" on passive range of motion at the shoulder, but motor and sensory exams were normal. (R. 374). The rest of Dr. Huhn's report was largely unchanged from January 2011, except that he diagnosed her with "probable overuse syndrome vs impingement syndrome vs cervical radiculopathy," (R. 375), ordered cervical x-rays, and prescribed tramadol for pain. (R. 376). When Plaintiff returned to Dr. Huhn on April 6, 2011, she reported very mild improvement in her shoulder pain with the tramadol. (R. 410). Dr. Huhn noted that a cervical x-ray[2] had shown extensive degenerative changes, so he added gabapentin to Plaintiff's pain regimen and ordered a cervical MRI. (R. 413). The remainder of his report was unchanged from March of that year.

The following month, on May 4, 2011, Dr. Huhn completed a physical RFC Questionnaire for Plaintiff. (R. 360-62). He listed her diagnoses as AIDS, chronic hepatitis C, hypertension, cervical radiculopathy, and myelosuppression.[3] Dr. Huhn indicated that Plaintiff had sharp pain and paresthesia in the left upper extremity which limited active motion above the head; pain along the C3-C7 distribution on the left side based on a passive range of motion exam; and paresthesia of the fingers. (R. 360). Plaintiff was taking gabapentin and tramadol to control her symptoms, but she suffered "side effects includ[ing] fatigue," and Dr. Huhn opined that pain would still constantly interfere with "the attention and concentration needed to perform even simple work tasks." (*Id.*).

---

[2]   The x-ray report itself is not part of the record.
[3]   Myelosuppression is "[a] condition in which bone marrow activity is decreased, resulting in fewer red blood cells, white blood cells and platelets." (www.cancer.gov/dictionary?cdrid=44173, last viewed on July 15, 2014).

With respect to physical activities, Dr. Huhn stated that Plaintiff can walk 10 city blocks without rest or severe pain; stand for one hour at a time; sit, stand and walk for about 4 hours in an 8-hour workday; occasionally lift 10 pounds; rarely lift 20 pounds; and never lift 50 pounds. (R. 360-61). Plaintiff has no restriction in using her right arm and hands, but she can reach with her left arm only 10% of the time during an 8-hour workday; grasp, turn, and twist objects with the left hand only 20% of the workday; and perform fine manipulations with the left hand only 20% of the workday. (R. 361). In addition, she must be able to shift at will from sitting to standing to walking; she needs one, unscheduled 15-20 minute break every day due to chronic fatigue and adverse effects of medication; she is likely to have good days and bad days; and she likely will be absent from work about 2 days per month. (R. 361-62).

At a follow-up appointment on June 29, 2011, Plaintiff asked Dr. Huhn for another audiology exam to try and qualify for hearing aids. (R. 377). She had missed a May 20, 2011 MRI test but Dr. Huhn told her to "hold off" on it because she reported "vast improvement" in her shoulder pain with the tramadol/gabapentin combination and the symptoms were now "well controlled." (R. 377, 381-82).

Plaintiff saw Dr. Rubin for another audiology exam on July 7, 2011. She denied experiencing any change in her hearing sensitivity since June 24, 2010, but wanted new hearing aids since hers were broken. (R. 392). Test results showed Plaintiff "will experience difficulties discerning most/all speech sounds when presented at/below normal conversational level," as well as "difficulties with sounds localization due to the asymmetrical nature of her HL [hearing loss]." Ms. Rubin recommended hearing aids for both ears. (R. 393).

7

More than two months later, on September 20, 2011, Plaintiff went to the Core Center walk-in clinic complaining of moderate back pain. (R. 415, 416). She exhibited a normal gait and normal range of motion, (R. 416), and Dianna McBride, CNP, diagnosed worsening, recurrent back pain and instructed Plaintiff to continue taking tramadol and gabapentin. (R. 417). Plaintiff saw Dr. Huhn for another scheduled follow-up appointment on September 29, 2011. She complained of "new onset LBP [lower back pain]" lasting several weeks, but described it as "improving" with gabapentin. (R. 442). The combination of gabapentin and tramadol also "worked" for Plaintiff's right upper extremity pain with cervical degenerative joint disease. (*Id.*). Dr. Huhn ordered a lower spine x-ray to check for degenerative joint disease and referred Plaintiff to "back school." (R. 445). There is no mention of fatigue during this visit, and the remainder of the report is unchanged.

The last available medical records are from January 3, 2012 when Plaintiff went to St. Bernard Hospital complaining of intermittent left-sided chest wall pain. (R. 452). She exhibited no motor or sensory deficits at that time, and had full range of motion in the neck, normal range of motion in the arms and legs, and no musculoskeletal problems. (R. 453). An echocardiogram revealed normal left ventricular systolic function, (R. 470), and a chest CT showed no acute pulmonary process, "no significant change in the appearance of the chest since 10/07/07," and mild chronic obstructive pulmonary disease. (R. 468).

B.  **Plaintiff's Testimony**

In a May 5, 2010 Function Report completed in connection with her application for disability benefits, Plaintiff stated that on a typical day she cleans up the house,

watches television, washes dishes, cooks meals for herself and her grandson, plays with her grandson, and uses her computer. (R. 204-06). She has no problems with personal care, (R. 205), and is able to vacuum and wash dishes for 2 hours, do laundry every 2 weeks, (R. 206), go outside every day, walk and use public transportation, and shop for food and clothes once a month. (R. 207). Plaintiff stated that she spends time with other people in person, on the phone and on the computer, but she has trouble talking, hearing, concentrating and remembering. (R. 208-09). She estimated that she can walk 2 blocks before needing to rest for 20 minutes, pay attention for 2 hours, and sometimes follow written instructions. Her ability to follow spoken instructions, however, is "not good." (R. 209). In a Physical Impairments Questionnaire completed the same day, Plaintiff indicated that she gets tired using her arms and hands, and her knees hurt when she bends, gets up from a chair or gets out of bed. (R. 213-14).

At the February 1, 2012 hearing before the ALJ, Plaintiff testified that she takes care of her grandson when her daughter is at work but spends most of her time sitting and watching television. (R. 42-43, 50). She is able to cook, clean the house once every week to two weeks, shop for groceries, and walk to the Laundromat two blocks from her home, though with difficulty. (R. 43-45). She can also stand and sit for five or ten minutes at a time and lift up to 15 pounds. (R. 44-45). Plaintiff stays in touch with friends and relatives through texts, a loud volume cell phone, and a video communication system, and said that "most of the time" she hears well with hearing aids. (R. 51, 53-54). She is also able to lip read if someone is close by. (R. 54). Plaintiff told the ALJ that the arthritis in her hands and right arm causes a lot of pain, and the pain in her neck "comes and goes" as well. (R. 55). She feels tired and sick as

9

a result of her HIV/AIDS, (R. 54), and the medications she takes cause stomach aches and drowsiness without always providing relief. (R. 49-50).

**C.    Administrative Law Judge's Decision**

The ALJ found that Plaintiff's HIV, hearing loss, arthritis and HCV are severe impairments, but that they do not meet or equal any of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. 20-21). After reviewing the medical records in detail, the ALJ determined that Plaintiff has the capacity to perform light work with the following restrictions: she can occasionally lift and carry 20 pounds; frequently lift and carry 10 pounds; sit, stand and walk for 6 hours in an 8-hour workday with normal rest periods; occasionally crouch, kneel and crawl; and occasionally handle and manipulate with her left arm. In addition, she cannot work at heights or frequently climb ladders, she should avoid operation of moving or dangerous machinery, she "is not suited for work requiring fine hearing discrimination," and she will be off-task about 4% of the time in an 8-hour workday. (R. 21).

In reaching this conclusion, the ALJ gave little weight to the opinions of Dr. Arjmand and Dr. Kenney that Plaintiff has no exertional, postural or manipulative limitations, explaining that the evidence shows she suffers from "additional impairments of HIV and arthritis that were not considered by the State agency consultants and warrant greater functional limitations." (R. 26). The ALJ also gave only "some weight" to Dr. Huhn's May 2011 opinion because it was inconsistent with his own treatment notes, which showed that Plaintiff experienced "vast improvement" in her back and shoulder pain in June 2011 and that her symptoms were "well controlled" with medication. (R. 27). As for Plaintiff's testimony, the ALJ found it significant that she

cares for an active grandson during the day, which "can be quite demanding both physically and emotionally," and can cook for herself, prepare simple meals for her grandson, clean the home, grocery shop and do laundry. (R. 28). She has also received conservative treatment in the form of medication management, and was able to communicate and participate effectively during her visits with Dr. Huhn despite her hearing loss. (R. 27-28).

Based on the stated RFC, the ALJ accepted the VE's testimony that Plaintiff cannot perform any of her past relevant work, but remains capable of performing a significant number of unskilled light jobs available in the national economy, including rental clerk, counter clerk, and usher. (R. 28-30). The ALJ thus concluded that Plaintiff is not disabled within the meaning of the Social Security Act, and is not entitled to benefits.

## DISCUSSION

### A. Standard of Review

Judicial review of the Commissioner's final decision is authorized by Section 405(g) of the Social Security Act. *See* 42 U.S.C. § 405(g). In reviewing this decision, the Court may not engage in its own analysis of whether Plaintiff is severely impaired as defined by the Social Security Regulations. *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004) (citation omitted). Nor may it "displace the ALJ's judgment by reconsidering facts or evidence or making credibility determinations." *Castile v. Astrue*, 617 F.3d 923, 926 (7th Cir. 2010) (quoting *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007)). The court's task is to determine whether the ALJ's decision is supported by substantial evidence, which is "'such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion.'" *McKinzey v. Astrue*, 641 F.3d 884, 889 (7th Cir. 2011) (quoting *Skinner*, 478 F.3d at 841).

In making this determination, the court must "look to whether the ALJ built an 'accurate and logical bridge' from the evidence to [his] conclusion that the claimant is not disabled." *Simila v. Astrue*, 573 F.3d 503, 513 (7th Cir. 2009) (quoting *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008)). Where the Commissioner's decision "'lacks evidentiary support or is so poorly articulated as to prevent meaningful review,' a remand is required." *Hopgood ex rel. L.G. v. Astrue*, 578 F.3d 696, 698 (7th Cir. 2009) (quoting *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002)).

**B. Five-Step Inquiry**

To recover DIB or SSI under Titles II and XVI of the Social Security Act, a claimant must establish that she is disabled within the meaning of the Act. *Keener v. Astrue*, No. 06-CV-0928-MJR, 2008 WL 687132, at *1 (S.D. Ill. Mar. 10, 2008).[4] A person is disabled if he is unable to perform "any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *Crawford v. Astrue*, 633 F. Supp. 2d 618, 630 (N.D. Ill. 2009). In determining whether a claimant suffers from a disability, the ALJ conducts a standard five-step inquiry: (1) Is the claimant presently unemployed? (2) Is the claimant's impairment severe? (3) Does the impairment meet or equal one of a list of specific impairments enumerated in the regulations? (4) Is the claimant unable to

---

[4] The regulations governing the determination of disability for DIB are found at 20 C.F.R. § 404.1501 *et seq.*, and are virtually identical to the SSI regulations set forth at 20 C.F.R. § 416.901 *et seq.*

perform her former occupation? and (5) Is the claimant unable to perform any other work? *See* 20 C.F.R. §§ 404.1520, 416.920; *Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000).

**C.     Analysis**

Plaintiff claims that the ALJ's decision must be reversed because he (1) did not provide an evidentiary basis for the RFC assessment that she is capable of light work; (2) failed to explain why she can work despite significant hearing loss; (3) provided no rationale for finding that she would be off-task for 4% of an 8-hour workday; (4) afforded improper weight to the opinion from Dr. Huhn; and (5) made a flawed credibility determination.

### 1.     RFC Assessment

Plaintiff argues that the ALJ's RFC assessment is flawed because it lacks any evidentiary basis. (Doc. 20, at 7; Doc. 26, at 1). A claimant's RFC is the maximum work that she can perform despite any limitations. 20 C.F.R. § 404.1545(a)(1); SSR 96-8p. "[T]he responsibility for the RFC assessment belongs to the ALJ, not a physician, [but] an ALJ cannot construct his own RFC finding without a proper medical ground and must explain how he has reached his conclusions." *Amey v. Astrue*, No. 09 C 2712, 2012 WL 366522, at *13 (N.D. Ill. Feb. 2, 2012). *See also* 20 C.F.R. §§ 404.1527(e)(2), 416.927(e)(2).

Here, the ALJ addressed Plaintiff's "HIV and hepatitis C and resulting fatigue related limitations," as well as her arthritis, by (1) restricting her to light work with only occasional lifting and carrying of 20 pounds; frequent lifting and carrying of 10 pounds; sitting, standing and walking for 6 hours in an 8-hour workday with normal rest periods;

and occasional gross handling and manipulation with the left arm; (2) precluding her from work involving heights, frequent ladder climbing and operation of moving or dangerous machinery; and (3) restricting her to only occasional crouching, kneeling and crawling. (R. 21, 23, 24). The ALJ also determined that Plaintiff "is not suited for work requiring fine hearing discrimination," and will be off-task about 4% of the time in an 8-hour workday. (R. 21).

Plaintiff claims this RFC finds no support in the record because the ALJ essentially rejected all of the available medical opinions, leaving "an evidentiary deficit that he was not permitted to fill with his own medical knowledge." (Doc. 20, at 7). The Court agrees. The ALJ gave little weight to the 2010 RFC assessment from Dr. Arjmand, affirmed by Dr. Kenney, that Plaintiff has no exertional, postural or manipulative limitations whatsoever. As the ALJ reasonably explained, "additional evidence . . . establishes additional impairments of HIV and arthritis that were not considered by the State agency consultants and warrant greater functional limitations." (R. 26). After taking Dr. Arjmand's opinion off the table, the ALJ then afforded only some weight to Dr. Huhn's more restrictive May 2011 opinion that Plaintiff is capable of less than light work. The ALJ certainly was not required to adopt Dr. Huhn's opinion, *Armstrong v. Barnhart*, 287 F. Supp. 2d 881, 886 (N.D. Ill. 2003), but he did need to explain why he found Plaintiff *less* limited than the only physician who prepared an RFC after considering all of Plaintiff's impairments in combination. This is especially true since Dr. Huhn is Plaintiff's sole treating physician, and his notes serve as the primary source of medical data in the record.

The ALJ discussed Dr. Huhn's treatment notes in detail, tracing Plaintiff's progress from January 2009 through September 2011. Based on his belief that Dr. Huhn's May 2011 opinion "appear[ed] to focus on [Plaintiff's] C3-C7 radicular pain and left upper extremity symptoms," the ALJ found it significant that her arthritis symptoms were "well controlled" by June 2011. (R. 27). He also observed that Plaintiff consistently exhibited normal range of motion, normal gait, and intact motor and sensory functions from January 2011 through January 2012. (R. 24-25, 27, 365, 374, 412, 416, 453). Unfortunately, "[e]ven when the record contains medical evidence concerning a claimant's ability to work, '[t]he ALJs are not permitted to construct a 'middle ground' RFC without a proper medical basis.'" *Newell v. Astrue*, 869 F. Supp. 2d 875, 891 (N.D. Ill. 2012) (quoting *Norris v. Astrue*, 776 F. Supp. 2d 616, 637 (N.D. Ill. 2011)). Dr. Huhn never suggested that as long as Plaintiff's arthritis is under control, she can perform at the light work level; the ALJ seems to have made that lay determination on his own. *See Suide v. Astrue*, 371 Fed. Appx. 684, 690 (7th Cir. 2010) (an ALJ is "not allowed to 'play doctor' by using her own lay opinions to fill evidentiary gaps in the record.").

The ALJ tried to get around the lack of medical support by stating that his RFC finding was "not entirely inconsistent with" Dr. Huhn's opinion. (R. 27). Given that the two assessments have no overlapping restrictions whatsoever, however, it is not clear how the ALJ determined that Plaintiff can sit and stand for 6 as opposed to say 5 hours, or perform the specific lifting requirements necessary for full-time light work. This is troubling because as a woman over 50 with only a high school education and no clear

transferable skills, Plaintiff would "grid out" if her restrictions limited her to sedentary jobs. *See Creasy v. Barnhart*, 30 Fed. Appx. 620, 623 n.2 (7th Cir. 2002).

The Court is aware that Plaintiff is able to perform childcare activities, and the ALJ fairly observed that they involve "a lot of lifting" and "can be quite demanding both physically and emotionally, without any particular assistance." (R. 27, 28). Yet Plaintiff testified that she only watches her grandson "on a sometime basis" because her daughter works "part-time." (R. 42). *See Beardsley v. Colvin*, __ F.3d __, 2014 WL 3361073, at *3 (7th Cir. 2014) ("[I]t is proper for the Social Security Administration to consider a claimant's daily activities in judging disability, but we have urged caution in equating those activities with the challenges of daily employment in a competitive environment, especially when the claimant is caring for a family member."). There is nothing in the record to explain how such part-time care supports an ability to sit, stand and walk for 6 hours a day with frequent lifting of 10 pounds and occasional lifting of 20 pounds five days per week.

Another problem is that the ALJ provided no explanation for how he determined that Plaintiff will be off-task for 4% of the workday. Defendant barely addresses this issue, stating in conclusory fashion in a footnote that Plaintiff "has failed to show that her impairments necessitated a more generous accommodation." (Doc. 25, at 8 n.4). The ALJ reasonably discounted Dr. Huhn's opinion that pain, fatigue and other symptoms would "constantly" interfere with Plaintiff's concentration and attention. Plaintiff testified at the hearing that she is able to care for an active grandson on at least a part-time basis, which certainly requires stretches of continuous attention. She is also able to shop, do laundry, clean and cook. (R. 27, 204). Nevertheless, the ALJ was not

then free to pick some lesser percentage of time that Plaintiff will lose focus without pointing to record evidence supporting that finding. As Plaintiff notes, the Court has no idea why the ALJ chose 4% "as opposed to five, ten, 15 or 20 percent," and the decision is silent on this issue. (Doc. 26, at 10). Notably, Dr. Huhn opined that Plaintiff will need to take an unscheduled break every day lasting 15 to 20 minutes, but the ALJ neither adopted this limitation nor asked the VE whether it is consistent with a person being off-task for 4% of the workday.

There is also some question regarding the extent to which hearing aids will improve Plaintiff's hearing. The ALJ acknowledged that in June 2010, Plaintiff was diagnosed with moderate to severe hearing loss. He also discussed the clinical notes from audiologist Rubin indicating that Plaintiff "would experience significant difficulties hearing speech in both ears" with "limited benefit from the use of amplification." (R. 25). A year later in July 2011, testing showed "severe rising to moderately-severe mixed hearing loss at 250 to 8000 Hz and moderately-severe sloping to profound sensorineural hearing loss at 250 to 8000 Hz for the left ear," as well as "a decrease[] in hearing sensitivity at 250 Hz for the right ear since June 2010." (R. 26). Ms. Rubin stated that Plaintiff "would experience difficulty discerning most/all speech when presented at or below normal conversational level in both ears," and she "would experience difficulties with sound localization due to the asymmetrical nature of her hearing loss." (*Id.*).

The ALJ does not explain how these test results demonstrate that Plaintiff is capable of all but "fine hearing discrimination." (R. 21). Dr. Arjmand indicated that Plaintiff must avoid concentrated exposure to noise, (R. 332), but neither he nor Dr.

Kenney had access to Ms. Rubin's July 2011 assessment showing further hearing loss in the right ear. Defendant notes that Plaintiff was able to attend appointments with Dr. Huhn alone and "communicate and participate effectively during those visits despite her hearing loss." (Doc. 25, at 6 (quoting R. 27)). Of course, such visits would not involve background noise or concerns about low talking or challenging accents, issues the VE raised at the hearing. (R. 63). In addition, though Plaintiff did testify that she mostly could hear well with hearing aids, it is not clear from the record that she has had fully functioning hearing aids since before June 2010, much less that they would still allow her to hear well despite further hearing loss. (R. 22, 53).

Viewing the record as a whole, the ALJ's RFC assessment is not supported by substantial evidence and the case must be remanded for further consideration of this issue.

### 2. Remaining Arguments

The Court does not find any specific errors with respect to the ALJ's decision to give Dr. Huhn's opinion only some weight, or his determination that Plaintiff's testimony was not fully credible. Nevertheless, the ALJ should take the opportunity on remand to reconsider these issues as necessary to make a proper RFC assessment.

### **CONCLUSION**

For the reasons stated above, Plaintiff's Motion to Reverse the Decision of the Commissioner of Social Security is granted, and Defendant's Motion for Summary Judgment [Doc. 24] is denied. Pursuant to sentence four of 42 U.S.C. § 405(g), the ALJ's decision is reversed, and this case is remanded to the Social Security Administration for further proceedings consistent with this opinion.

Dated: July 18, 2014

ENTER:

_____
SHEILA FINNEGAN
United States Magistrate Judge